McMORAN, O'CONNOR, BRAMLEY & BURNS, P.C.
Douglas S. Bramley, Esq., Bar No. 034271998
Ramshorn Executive Centre
2399 Highway 34
Bldg. D Suite D-1
Manasquan, New Jersey 08736
(732) 223-7711
dbramley@mcmoranlaw.com
Attorneys for Plaintiff,
Ronald Autodore

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RONALD AUTODORE,<br><br>Plaintiff,<br><br>v.<br><br>McKESSON CORPORATION,<br><br>Defendant. | Civil Action No.<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff RONALD AUTODORE, residing at 4 Meadow Drive, Little Falls, New Jersey, 07424, by and through undersigned counsel, alleges as follows:

## PRELIMINARY STATEMENT

Plaintiff Ronald Autodore ("Plaintiff" or "Autodore"), by and through his undersigned counsel, brings this action against defendant McKesson Corporation ("McKesson" or the "Company") for whistleblower retaliation, failure to accommodate his disabilities, and disability-related retaliation. McKesson terminated Autodore on March 24, 2026, after he: (a) objected to directives from his manager requiring him to falsely charge substantially more of his working time to a multi-hundred-million-dollar capital expenditure program than had been authorized; (b) refused to continue making the inflated time allocations; and (c) filed formal internal compliance complaints concerning the directives and their potential financial-reporting implications. Within

weeks, McKesson initiated a performance process against him and ultimately terminated his employment. McKesson's actions violated the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1, *et seq.*, and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1, *et seq.*

## JURISDICTION AND VENUE

1. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because this action is between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2. Plaintiff is a citizen of the State of New Jersey.

3. Defendant is a corporation incorporated under the laws of the State of Delaware with its principal executive offices located at 6555 State Highway 161, Irving, Texas 75039. McKesson is a citizen of Delaware and Texas for purposes of 28 U.S.C. § 1332(c)(1).

4. Complete diversity exists between Plaintiff and Defendant.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Plaintiff resided and worked in New Jersey during his employment with McKesson, the events giving rise to this action occurred substantially within New Jersey, and McKesson conducts business within New Jersey.

## THE PARTIES

6. Plaintiff is, and at all relevant times was, a citizen and domiciliary of the State of New Jersey. He was employed by McKesson as a Lead Cybersecurity Architect.

7. Autodore is a qualified individual with disabilities under the NJLAD.

8. Defendant McKesson Corporation is a corporation organized and existing under the laws of Delaware, with its principal executive offices in Irving, Texas. McKesson is a

publicly traded company that conducts substantial business and maintains facilities and operations in New Jersey and whose common stock is traded on the New York Stock Exchange.

9. At all relevant times, McKesson was an "employer" within the meaning of CEPA, N.J.S.A. 34:19-2(a), and the NJLAD, N.J.S.A. 10:5-5(a).

10. Upon hire, McKesson provided Autodore with notice of his rights under CEPA, thereby acknowledging that his employment was governed by New Jersey law.

## STATEMENT OF FACTS

### Background and Employment

11. Autodore commenced employment with McKesson on January 27, 2025 as Lead Cybersecurity Architect.

12. At all relevant times, Autodore was a remote employee who lived and worked for McKesson in New Jersey.

13. Upon hire, Autodore identified himself as having a disability on McKesson's disability self-identification form.

14. Autodore's direct manager was Jean-Pierre Nzinga ("Nzinga").

15. At all relevant times, Nzinga had authority over Autodore's employment, performance evaluations, and day-to-day supervision.

16. Prior to the events described herein, all the performance feedback McKesson provided to Autodore was positive. He received his full target bonus and a salary increase in June 2025. He never received a formal performance review of any kind in McKesson's Workday performance management system.

**The MTAP Program and Time-Allocation Directives**

17. The McKesson Technology Accelerated Program ("MTAP") is a multi-year, multi-hundred-million-dollar capital expenditure ("CapEx") program.

18. Autodore understood that MTAP included IT systems and infrastructure supporting McKesson's federal government contracts.

19. Autodore's approved budget allocation to the MTAP program was 7% of his working time, representing approximately 11 to 13 hours per month. The remaining 93% of Autodore's time was allocated to a multitude of non-MTAP responsibilities.

20. Beginning in August 2025, Nzinga directed Autodore on multiple occasions to falsely allocate 90% to 100% of his working time to MTAP and, specifically, to the Cyber Resilience aspect of the MTAP program. These directives were given notwithstanding Autodore's approved budget allocation of only 7%.

21. On August 20, 2025, for example, Nzinga explicitly instructed Autodore to allocate "eight hours a day" to MTAP. When Autodore raised concerns about the accuracy of such an allocation, Nzinga responded dismissively, stating "who cares." Nzinga also coached Autodore on how to avoid scrutiny from MTAP's program manager, Clarence Finchett ("Finchett").

22. Autodore understood that Nzinga's directives would require him to misclassify indirect operational expense ("OpEx") as direct capital expenditure ("CapEx") under MTAP. Autodore reasonably believed that inflating the costs charged to MTAP in this manner was fraudulent and would improperly increase capitalized costs and assets, decrease reported period expenses, and result in inaccurate financial reporting by McKesson. Based upon his work with MTAP and his familiarity with McKesson's time-allocation process, Autodore understood that

labor time allocated to MTAP was charged to the MTAP capital expenditure program and treated as a capitalized project cost.

23. Autodore further understood that MTAP included IT systems supporting McKesson's federal government contracts and reasonably believed that the improper allocation of labor costs to MTAP could result in inaccurate costs being attributed or reported in connection with those federal programs.

**Autodore's Protected Activity**

24. Autodore believed Nzinga's directives were inaccurate, fraudulent, and unlawful and objected to and refused to participate in the inflated time allocations. Autodore independently verified with Finchett that his approved budget allocation to MTAP was only 7%.

25. Beginning the week of October 13, 2025, Autodore refused to continue making the inflated time entries directed by Nzinga. Nzinga nonetheless continued to pressure Autodore to allocate all of his time to MTAP.

26. On November 4, 2025, Autodore filed a formal compliance complaint through McKesson's EthicsPoint portal (the "Ethics Complaint"). The Ethics Complaint explicitly referenced Nzinga's directives, his dismissive statements ("who cares"), and the potential impact of the inflated MTAP allocations on McKesson's financial reporting and stockholders.

27. Autodore's objections to Nzinga's directives, his refusal to continue making the inflated time allocations, and his Ethics Complaint constituted protected activity under CEPA.

**Retaliation: The Manufactured Performance Process**

28. In early December 2025, approximately one month after Autodore filed his Ethics Complaint, McKesson zeroed out Autodore's 7% MTAP budget allocation. McKesson later cited decreased MTAP workload as the stated basis for eliminating Autodore's position.

29. Three days after eliminating his MTAP budget allocation, on December 8, 2025, Nzinga issued Autodore a Letter of Expectations ("LOE") citing alleged performance deficiencies.

30. The LOE identified tasks that did not align with Autodore's actual job description and cited subjective alleged deficiencies - including purported lack of "strategic thinking" and "business acumen" - that had never previously been identified by Nzinga or any other McKesson employee.

31. The LOE was issued outside of McKesson's designated performance review window, without any Human Resources involvement, and without any prior warnings or counseling of any kind. The LOE contained no objective benchmarks for improvement.

32. The timing of the LOE - approximately one month after the Ethics Complaint and three days after McKesson eliminated Autodore's MTAP budget allocation - supports an inference of retaliation.

33. Autodore experienced an exacerbation of symptoms associated with his disabilities following issuance of the LOE.

34. On December 9, 2025, Autodore complained to Toni Burton ("Burton"), the investigator assigned to his Ethics Complaint, that the LOE was retaliatory. Burton suggested he contact Employee Relations.

35. On December 9, 2025, Autodore called McKesson's Employee Relations Hotline and filed a formal complaint of retaliation.

36. On January 5, 8, and 12, 2026, Autodore met with Nzinga to discuss the LOE. On all three occasions, Autodore requested the involvement of Human Resources. Nzinga rejected each request and admitted that Human Resources was unaware of the LOE.

37. On January 27, 2026, McKesson informed Autodore that his retaliation complaint to the Employee Relations Hotline was being "closed out" as unsubstantiated. McKesson provided no details, explanation, or description of any investigation.

38. On February 24, 2026, Nzinga closed out the LOE and informed Autodore that he was being placed on a formal Performance Improvement Plan ("PIP"). Nzinga never provided Autodore with a written PIP, specified the areas of alleged deficiency with particularity, or identified the metrics by which improvement would be measured.

39. By February 24, 2026, Autodore was experiencing disability-related limitations that were affecting his ability to work under the conditions then being imposed upon him. Autodore informed Nzinga that he required a reasonable accommodation for his disabilities and requested assistance from Human Resources in identifying and obtaining an appropriate accommodation.

40. Autodore sought to engage McKesson's Human Resources and accommodation process to determine what reasonable accommodations were available that would permit him to continue performing his job.

41. Instead of referring Autodore to Human Resources or initiating the interactive process, Nzinga insisted that Autodore first disclose directly to him the specific medical condition underlying his request for accommodation.

42. On February 27, 2026, Autodore filed another formal retaliation complaint through McKesson's Human Resources portal, specifically addressing the February 24 meeting with Nzinga, the PIP, and Nzinga's response to his request for accommodation.

43. On March 5, 2026, McKesson formally closed its investigation into Autodore's Ethics Complaint. The Company refused to disclose its findings or whether any corrective action was taken.

44. On March 9, 2026, Autodore participated in a call with Shauna Butrym ("Butrym"), an Employee Relations Consultant, regarding his February 27 retaliation complaint. Butrym stated she would "look into" the PIP and referred Autodore to MetLife to begin an interactive dialogue concerning his disabilities.

45. On March 10, 2026, the next day, and before the accommodation process or any meaningful review of Autodore's pending retaliation complaint had occurred, McKesson notified Autodore that his employment would be terminated effective March 24, 2026, due to a purported "role elimination" caused by an alleged decreased MTAP workload. Within hours of notifying Autodore of his termination, McKesson disabled his network access.

**The Role Elimination Rationale Is Pretextual**

46. McKesson's stated rationale for termination - "role elimination" due to decreased MTAP workload - is pretextual.

47. Neither the MTAP project nor the Cyber Resilience program had been completed at the time of Autodore's termination. Autodore was not aware of any material decrease in the MTAP workload that would explain the elimination of his position.

48. In addition, Autodore's time was only nominally tied to MTAP at a 7% budget allocation. His substantial non-MTAP responsibilities, comprising approximately 93% of his working time, remained unchanged and were not eliminated.

49. The MTAP budget allocation McKesson later relied upon to justify Autodore's termination had been zeroed out in early December 2025, approximately one month after his

Ethics Complaint. McKesson subsequently relied upon the resulting reduction in Autodore's MTAP allocation as a basis for eliminating his position, even though approximately 93% of his responsibilities were unrelated to MTAP and remained unchanged.

50. McKesson had actual knowledge of Autodore's protected activity. Nzinga personally received Autodore's objections to the inflated MTAP time-allocation directives and knew that Autodore had refused to continue making the disputed entries. McKesson's Ethics and Compliance personnel had actual knowledge of Autodore's November 4, 2025 Ethics Complaint, and Employee Relations had actual knowledge of his subsequent complaints that he was being retaliated against for raising those concerns.

51. Nzinga, who directly supervised Autodore and had authority over his performance evaluations and day-to-day employment, initiated and administered the performance process that followed Autodore's protected activity, including the December 8, 2025 Letter of Expectations and the February 24, 2026 Performance Improvement Plan.

52. McKesson made the decision to terminate Autodore's employment, purportedly based upon the elimination of his position, while his Ethics Complaint and subsequent retaliation complaints had been reported to and investigated by McKesson and while the performance process initiated by Nzinga remained ongoing. The decision was communicated on March 10, 2026, one day after Autodore spoke with Employee Relations concerning his pending retaliation complaint. The sequence and timing of these events support an inference of retaliation.

53. McKesson delegated to its Ethics and Compliance function and to its Human Resources and Employee Relations personnel the responsibility to receive, investigate, and remediate complaints of retaliation and discrimination and to ensure that McKesson maintained a workplace free of retaliation and discrimination. Those functions possessed the authority to

investigate Autodore's complaints, to halt the performance process initiated against him, and to prevent or reverse the elimination of his position.

54. Despite actual knowledge of Autodore's protected activity and his repeated complaints that he was being retaliated against, McKesson's Ethics and Compliance, Human Resources, and Employee Relations personnel closed his complaints as "unsubstantiated," permitted the performance process initiated by Nzinga to continue, and failed to prevent the termination of his employment.

**COUNT ONE**

**(Conscientious Employee Protection Act, N.J.S.A. 34:19-1, *et seq.*)**

55. Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs as if fully set forth herein.

56. CEPA prohibits an employer from taking retaliatory action against an employee who objects to, or refuses to participate in, any activity, policy, or practice that the employee reasonably believes (a) is in violation of a law, rule, or regulation promulgated pursuant to law, N.J.S.A. 34:19-3(c)(1), or (b) is fraudulent or criminal, N.J.S.A. 34:19-3(c)(2). CEPA also prohibits an employer from taking retaliatory action against an employee who discloses, or threatens to disclose, to a supervisor or public body an activity, policy, or practice of the employer that the employee reasonably believes is in violation of a law, regulation, or rule promulgated pursuant to law. N.J.S.A. 34:19-3(a).

57. At all relevant times, McKesson was an "employer" within the meaning of CEPA, N.J.S.A. 34:19-2(a), and Autodore was an "employee" within the meaning of CEPA, N.J.S.A. 34:19-2(b).

58. Nzinga's directives to record labor substantially in excess of Autodore's authorized MTAP allocation and thereby classify operating labor expense as capital expenditure constituted conduct that Autodore reasonably believed was fraudulent and contrary to federal laws and regulations requiring publicly traded companies to maintain accurate books and records and adequate internal accounting controls and prohibiting materially false or misleading financial reporting.

59. Autodore engaged in protected activity under CEPA by objecting to Nzinga's directives to inflate his MTAP time allocations, refusing to continue making the inflated entries, and reporting the conduct in his November 4, 2025 Ethics Complaint.

60. McKesson took retaliatory action against Autodore as a result of his protected activity, including zeroing his MTAP budget allocation, issuing the LOE, subjecting him to the PIP, and terminating his employment.

61. As a direct and proximate result of McKesson's unlawful retaliatory conduct, Autodore has suffered and continues to suffer damages, including lost wages, lost benefits, emotional distress, humiliation, and damage to his professional reputation.

62. McKesson's retaliatory conduct was knowing, intentional, and undertaken in willful disregard of Autodore's rights under CEPA. Autodore therefore seeks punitive damages to the extent permitted by N.J.S.A. 34:19-5.

63. Autodore is entitled to all relief available under CEPA, including reinstatement, back pay, front pay, compensatory damages, punitive damages, and reasonable attorneys' fees and costs. N.J.S.A. 34:19-5.

**COUNT TWO**

**(New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.*)**

64. Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs as if fully set forth herein.

65. The NJLAD prohibits an employer from discriminating against an employee because of disability, N.J.S.A. 10:5-12(a), requires an employer to reasonably accommodate an employee's disability absent undue hardship, N.J.A.C. 13:13-2.5, and prohibits retaliation against an employee because the employee has opposed conduct prohibited by the NJLAD or exercised rights protected by the NJLAD, N.J.S.A. 10:5-12(d).

66. At all relevant times, Autodore was a qualified individual with disabilities within the meaning of the NJLAD and was capable of performing the essential functions of his position with or without reasonable accommodation.

67. Autodore identified himself as having a disability on McKesson's disability self-identification form at the commencement of his employment. By no later than February 24, 2026, McKesson had actual notice that Autodore was experiencing disability-related limitations and was requesting assistance in obtaining reasonable accommodation.

68. On February 24, 2026, Autodore informed Nzinga that he required reasonable accommodation for his disabilities and requested that Human Resources become involved in the accommodation process.

69. Rather than referring Autodore to Human Resources or otherwise initiating McKesson's accommodation process, Nzinga insisted that Autodore first disclose directly to him the medical condition underlying his request. McKesson did not initiate an interactive process with Autodore at that time to determine whether a reasonable accommodation was available.

70. On February 27, 2026, Autodore filed a formal complaint through McKesson's Human Resources portal concerning, among other things, Nzinga's response to his request for accommodation and McKesson's failure to address that request.

71. On March 9, 2026, McKesson referred Autodore to MetLife to initiate the accommodation process. The following day, March 10, 2026, before that process could meaningfully occur or any accommodation could be considered or implemented, McKesson notified Autodore that his employment was being terminated effective March 24, 2026.

72. By failing to timely engage in the interactive process and terminating Autodore before his request for reasonable accommodation could be meaningfully considered, McKesson prevented the interactive process from determining whether and what reasonable accommodations were available that would have permitted Autodore to continue performing the essential functions of his position.

73. Autodore's request for reasonable accommodation and his February 27, 2026 complaint concerning McKesson's response to that request constituted activity protected by the NJLAD. The close temporal proximity between that protected activity and McKesson's decision to terminate his employment, including McKesson's notification of termination one day after referring him to MetLife to begin the accommodation process, supports an inference that Autodore's exercise of rights protected by the NJLAD was a motivating factor in McKesson's decision to terminate his employment.

74. McKesson's failure to timely engage in the interactive process and reasonably accommodate Autodore's disabilities, and its retaliation against him for requesting accommodation and complaining about McKesson's response to that request, violated the NJLAD.

75. McKesson's conduct was knowing, intentional, and undertaken in willful disregard of Autodore's rights under the NJLAD. Despite having actual knowledge of Autodore's request for reasonable accommodation and his complaint concerning McKesson's response to that request, McKesson terminated his employment before his request for accommodation could be meaningfully considered. Autodore therefore seeks punitive damages to the extent permitted under the NJLAD.

76. Autodore is entitled to all relief available under the NJLAD, including reinstatement, back pay, front pay, compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

**DAMAGES**

77. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer the following damages:

a. Loss of employment and income, including back pay, plus interest;

b. Front pay representing the present value of lost future earnings;

c. Loss of employee benefits, including health insurance, retirement contributions, and other benefits;

d. Compensatory damages for emotional distress, mental anguish, humiliation, and harm to professional reputation;

e. Punitive damages under CEPA and the NJLAD;

f. Reasonable attorneys' fees and costs pursuant to N.J.S.A. 34:19-5, and N.J.S.A. 10:5-27.1; and

g. Such other and further relief as the Court deems just and equitable.

## PRAYER FOR RELIEF

WHEREFORE, Autodore demands judgment against Defendant as follows:

a. A declaration that McKesson's conduct violated CEPA and the NJLAD;

b. An order reinstating Plaintiff to his former position, or in the alternative, an award of front pay;

c. An award of back pay, with interest, for all wages and benefits lost as a result of Defendant's unlawful conduct;

d. An award of compensatory damages for emotional distress and other non-economic harm;

e. An award of punitive damages under CEPA and the NJLAD;

f. An award of reasonable attorneys' fees and costs;

g. Pre- and post-judgment interest to the extent permitted by law; and

h. Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff Ronald Autodore hereby demands a trial by jury on all issues so triable pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I hereby certify that the matter in controversy is also the subject of an administrative proceeding pending before the United States Department of Labor, Occupational Safety and Health Administration ("OSHA"), in which Plaintiff Ronald Autodore has asserted a claim against McKesson Corporation for retaliation under Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A. The OSHA complaint was filed on August 25, 2026 and remains pending. Other than the foregoing administrative proceeding, to the best of my knowledge,

information, and belief, the matter in controversy is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding. I certify under penalty of perjury that the foregoing is true and correct.

**CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1**

The amount in controversy exceeds $150,000, exclusive of interest, costs, and any claim for punitive damages.

**DESIGNATION OF TRIAL COUNSEL**

Plaintiff hereby designates Douglas S. Bramley, Esq. as trial counsel.

McMORAN, O'CONNOR, BRAMLEY & BURNS, P.C.
Ramshorn Executive Centre
Building D, Suite D-1
2399 Highway 34
Manasquan, New Jersey 08736
Attorneys for Plaintiff

By: */s/ Douglas S. Bramley*
DOUGLAS S. BRAMLEY

Dated: August 26, 2026